## J. H. ROBISON v. THE STATE.

### No. 3707.  Decided October 20, 1915.

### Rehearing denied November 17, 1915.

**1.—Slander of Female—Privileged· Communication—Voluntary Affidavit.**

Where, upon trial of slander of a female, the record disclosed on appeal that the voluntary affidavit made by the defendant, and upon which the prosecution was based, imputed a want of chastity to the alleged female and was ·but a reiteration of the oral slander which the defendant had circulated prior thereto, the contention that the same was a privileged communication, because the defendant had been induced to make the affidavit, is untenable. Distinguishing McDonald v. State, 73 Texas Crim. Rep., 125, and other cases.

**2.—Same—Case Stated—Privileged Communication.**

Where, upon trial of slander of a female, the record disclosed on appeal that defendant had uttered the original slander, if it be slander, before he made a voluntary affidavit, reiterating the same, he can not plead privileged communication, because of the fact of making such affidavit at the suggestion of another. Following Davis v. State, 74 Texas Crim Rep., 298.

**3.—Same—Rule Stated—Slander—Definition.**

Where a person originates a slander, and afterwards repeats it in answer to a question by the person slandered, in the presence of a third person, brought by him for the purpose of hearing the answer, the repetition.is slander.

**4.—Same—Rule Stated—Slander Defined—Personal Knowledge.**

Where one originates a slander, and repeats it in the presence of others, and asserts it to be within his personal knowledge, the statement not being true, is slander; it is different where he only hears the statement, and does not claim to have any personal knowledge of the matter.

**5.—Same—Rule Stated—Malice—Good Faith—Rule Stated.**

If it should be determined that the communication is privileged, exemption from liability will not exist if it was made upon express malice, or with a want of good faith. Following Davis v. Wells, 25 Texas Civ. App., 155.

**6.—Same—Charge of Court—Privileged Communication—Malice—Charge of Court.**

Where, upon trial of slandering a female, defendant insisted that even though the communication was not privileged, it ought to be held qualifiedly privileged, that is, the evidence must show that malice existed in the mind of the defendant at the time he made the false statement, but the court instructed the jury that they must find beyond a reasonable doubt from the evidence that said statement of defendant was either maliciously or wantonly made, before they could convict the defendant, there was no reversible error, the evidence supporting the conviction.

**7.—Same—Rule Stated—Malice—Privilege—Knowledge of False Statement.**

Malice on the part of the defendant destroys his privilege, and such malice may be shown by the style and tone of the libelous statement, or by the fact that publication was made without exercising care and diligence to ascertain the truth, and where defendant knew at the time he made the alleged statement that it was false, and the jury found that it was untrue in fact, under proper instructions of the court, the conviction for slander is sustained.

**8.—Same—Evidence—Bias of Witness.**

Upon trial of slander of a female, it was permissible to show the bias and interest of certain witnesses, and the fact that another witness gave the complainant the information he did, so as to show a thorough comprehension of the case.

**9.—Same—Medical Examination—Practice—When Request Should Be Made.**

Where, upon trial of slandering a female, the defendant on cross-examination of such female, during the trial asked her if she was willing to undergo a medical examination to determine who was telling the truth in the matter, and the court sustained an objection to such question, and the bill of exceptions did not show the answer of the witness, or what it would have been, or what defendant expected it to be, nor that if the witness agreed to undergo such examination what defendant believed would be the result, there was no reversible error; besides, such a request should have been made in time, and not in the midst of the trial.

**10.—Same—Practice—Misdemeanor—Objections to Charge of Court.**

In misdemeanor cases, it is the better practice to read the charge to the jury, as in felony cases, before argument, but this is not mandatory, and where the charge was submitted to counsel before it was read to the jury, and no exceptions were reserved thereto, complaint could not be made thereto for the first time in the motion for new trial.

**11.—Same—Sufficiency of the Evidence—Requested Charge—Privileged Communication.**

Upon trial of slandering a female, where the evidence showed that the communication was not privileged, but supported the conviction, there was no

error in the court's failure, or refusal, to charge a peremptory acquittal, or that the communication was privileged.

Appeal from the County Court of Hamilton. Tried below before the Hon. J. L. Lewis.

Appeal from a conviction of slander of a female; penalty, a fine of $100 and six months confinement in the county jail.

The opinion states the case.

*Langford & Chesley* and *Mears & Watkins,* for appellant.—Cited cases in the opinion.

, *C. C. McDonald,* Assistant Attorney General, for the State.—Cited cases in opinion.

HARPER, JUDGE.—Appellant was convicted of slander, and prosecutes this appeal. The alleged slander is based upon an affidavit made by him before E. Brooks, justice of the peace, in which he stated on oath, "that he had been going with Miss Elmer Stephens on and off for about one year. I had free intercourse with her as often as I wanted to during all that time." Proper innuendo averments are contained in the complaint and information. A number of questions are raised in the motion for a new trial, but appellant's counsel, in able oral argument before this court and in the brief filed, discussed but one question, and that is that the affidavit was made under circumstances which made it a privileged communication, or qualified privileged communication. However, he stated that he did not waive the other questions raised, and in the event we held against him on this contention, he asked that we pass also on all other questions in the record. The record before us would disclose that Joe Martin, in a conversation with George Smith, had told Smith that Miss Stephens was pregnant; that Robison (appellant) had a baby on the road; and Robison had received a letter from Miss Stephens' father to come and get the girl or take a shotgun, or words of similar import. Mr. Wolf, learning such a report was in circulation, informed Mr. Stephens of the report and that Joe Martin was circulating it. Mr. Stephens told his son, Harrison Stephens, and Harrison Stephens went to see appellant about the report that Martin was circulating. He says, knowing that appellant (Robison) had been going with his sister, and believing that the report put in circulation by Martin was a slander, he went to see appellant about the matter, and asked him how he considered the character of his sister, and appellant replied that it was bad; that he then asked appellant if he would make a statement of what had occurred between him and the girl, and he said he would if someone else was called as a witness. Harrison Stephens and appellant then went to Justice Brooks when appellant made the statement recited in the complaint, and swore to it.

Appellant contends that these circumstances rendered the statement

privileged and no prosecution could be based thereon, and cites us to the cases of Davis v. State, 22 S. W. Rep., 979; Hix v. State, 20 S. W. Rep., 550, and McDonald v. State, 73 Texas Crim. Rep., 125, as sustaining such contentions. We do not think they have any application to a case of this character. In Hix's case the facts show that Mr. Wilkerson had heard that Hix had slandered his daughter by making certain statements. A meeting was arranged, and at that meeting Hix denied ever having repeated the language he heard, but told Mr. Wilkerson "that his wife had been informed by Allen Glascoe that Dr. Zachary had said that Miss M. E. Wilkerson had miscarried." Thus it is seen that Hix disclaimed having ever repeated the statement to anyone and gave the source of his information, and merely repeated to the father what he had heard in order that the father could discover and bring to justice the slanderer. This was held privileged, of course, and not the basis for a slander charge against Hix. There was no proof that Hix had repeated the slander, or that he had done more than Mr. Wolf did in this case, and that was, give to the father information by which he could seek out and discover the slanderer, if a slander had been uttered, and no one contends that Mr. Wolf's acts would render him liable to a criminal prosecution.

In Davis' case the facts are not stated, but the case was reversed because of a variance in the complaint and information. However, in the opinion it is stated: "Being pressed by the father of the girl, he said to the father he had seen his daughter engaged in an illicit act with one H. Keeling," citing Hix v. State, supra. And the opinion shows that the remark was not made in the presence of any other person. We are not informed what the facts in that case were, but if the remark made by Davis was originating a slander, was in fact false, even if spoken to him alone, we are of the opinion that a charge of slander could be based thereon, and this court has so held in several cases since that opinion was rendered. In McDonald's case the facts show that Whynan went to McDonald and asked what was the trouble between him and his wife. McDonald at first declined to state, but upon Whynan insisting, he told Whynan that he had heard that his wife 'was having sexual intercourse with divers persons, and J. R. Wagner had told him (McDonald) that eight different men had had intercourse with his (Whynan's) wife. The record discloses that McDonald had made this statement to no other person, but simply told Whynan what he had heard, upon being pressed. He also told Whynan that he, McDonald, had also had intercourse with his wife. In the opinion it is shown the slander charge was based on what McDonald told Whynan he had heard, and not on what McDonald himself stated of his own knowledge, and the opinion states, in holding the alleged communication privileged, "we are not discussing that part of his communication to Whynan that he himself had had sexual intercourse with Mrs. Whynan, if false." It was thus made plain in that opinion, if the basis for the alleged slander had been what McDonald himself had stated as true, and it in fact was false, it could be made the basis

for a charge of slander. These are all the cases cited by appellant on this question. In Davis v. State, 74 Texas Crim. Rep., 298, 167 S. W. Rep., 1108, this court held that though one went to another to inquire about a matter, and the person thus approached should himself utter a false and slanderous statement, affirming the truth, a prosecution could be based thereon.

But the facts in this case are wholly different from the facts in either of the above cited cases. In this case it is shown, and appellant in his testimony on the trial admits, he told Joe Martin what Martin told Smith. This was the origin of the slander, if slander it be. When Wolf told Mr. Stephens what Joe Martin was circulating, Stephens had no knowledge that appellant was the originator of the statements alleged to be slanderous. And as the statements of Martin coupled appellant's and his daughter's name, what was more natural than appellant should be applied to to aid the family of the girl in refuting the slander being circulated by Martin. But when applied to, appellant, being aware of the fact that he originated the report, and had told Martin all Martin was telling, does not inform the family of the girl that he had done so, but proceeds to amplify the slanderous report, and make statements that he knew were false, if false—statements he knew would damn the girl in the eyes of the public. And not content to make the statement to the brother, he suggests a third person being present, and to this third person, called in at his suggestion, he proceeds to make an affidavit to this third person, alleging: "I had free intercourse with Elmer Stephens as often as I wanted to." The rules of law, under such state of facts, is that the rule of privilege does not apply where there has been a previous unprivileged publication by the defendant of the same or similar libel or slander, which causes the inquiry to be made, for in that case it is the defendant by his own wrongful act who brings it on himself. (Odger on Slander, p. 294.)

In Cyc., volume 25, page 371, the rule is stated to be: Where a person originates a slander and afterwards repeats it in answer to a question by the person slandered, in the presence of a third person brought by him for the purpose of hearing the answer, the repetition is slander.

In Griffith v. Lewis, 7 Q. B., 61, the court held: "Where plaintiff inquired of defendant if he had accused her of using false weights in her trade, and defendant, in the presence of a third person, answered, 'to be sure I did. You have done it for years,'" it was held to be a slander for which an action would lie. See also Watson v. Nicholas, 6 Humph. (Tenn.), 174; Nott v. Stoddard, 38 Vt., 25, and cases cited. It is thus seen where one who originates the slander, repeats it in the presence of others, and asserts it to be within his personal knowledge, the statement not being true, is slander. There is a broad difference between such an allegation and a statement by the person approached that he had heard another say so and so, and does not claim to have any personal knowledge of the matter. While this exact question has never before been before this court in so far as we have been able to ascertain, yet we are not without precedent in the decisions of this State.

In the case of Davis v. Wells, 25 Texas Civ. App., 155, one of our Courts of Civil Appeals had a similar question before them, and they held it libelous and that an action would lie thereon, they saying, "if it should be determined that the communication is privileged, exemption from liability will not exist if it was made upon express malice or with a want of good faith." In this case there can be no question of good faith. Appellant alleged that he had carnal knowledge of the girl, and on the witness stand he asserts this to be true, and the court instructed the jury "that if you believe from the evidence that the said Elmer Stephens, at the time of the alleged imputation of want of chastity, if you find such imputation was made by defendant, was guilty of the acts set out in the information in this case; or that at said time the said Elmer Stephens was not a chaste and virtuous woman, you will acquit the defendant, whether you believe such want of chastity resulted from sexual intercourse with the defendant or some other person." The jury under such charge must have found that the appellant's statement was false, else they would not have convicted him, and as he alleged he had carnally known the young lady, it is apparent, if false, such statement could not have been made in good faith.

Counsel insisted though that even though the communication was not privileged, it ought to be held qualifiedly privileged—that is, the evidence must show that malice existed in the mind of defendant at the time he made the false statement. The court so instructed the jury in his charge, telling them:

"In order to entitle the State to a conviction in this case, the alleged imputation of a want of chastity in the said Elmer Stephens, if made by the defendant, must have been made either maliciously or wantonly. Therefore, I further charge you that although you may believe from the evidence, beyond a reasonable doubt, that the defendant did impute to the said Elmer Stephens a want of chastity by saying of and concerning her the things set out in the information in this case, yet, if you believe from the evidence that such things, so set out in said information, if said by the defendant, was not said either maliciously or wantonly; or if you have a reasonable doubt thereof, you will acquit the defendant." In other parts of the charge defining the words wanton and malicious.

And the evidence will support a finding that the statement was maliciously made. It is true appellant testified on the trial he had no ill-will towards any of the Stephens family, but his acts and conduct contradict his words. He had been going with Miss Stephens. Her father commanded her to stop going with appellant. She informs appellant that he can come to see her no more—that her father forbids. The father says appellant had been getting drunk, and engaging in other unseemly conduct, and this was the reason for forbidding him to come to his home. As soon as appellant is informed he was forbidden the house, he hunts up Joe Martin and puts this slander in circulation, and when questioned about it, reiterates and affirms it to be true. He

admits the young lady was at this time associating with his sisters and the best people in the community. All the witnesses say that prior to the time appellant put this calumny in circulation Miss Stephens' general reputation for virtue and chastity was good and they had never heard it questioned. That she moved in the best circles of society. This would authorize the jury to find that appellant acted with malice, if they believed his statement to be false; and the general rule is, as stated in Cyc: "Malice on the part of defendant destroys his privilege. Such malice may be shown by the style and tone of the libelous statement, or by the fact that publication was made without exercising care and diligence to ascertain the truth." In this instance there was no question of exercising care and diligence to ascertain the truth of the statement—appellant knew at the time he made the statement it was false, if it in fact was untrue, and the jury so found under proper instructions. And so holding, there was no error in admitting the affidavit in evidence.

The bills in regard to admitting in evidence the statement of Wolf to Mr. Stephens; the questions propounded to W. L. and Az Henderson as qualified and approved by the court, present no error. It was permissible to show the bias and interest of the two Hendersons and the fact that Mr. Wolf gave Mr. Stephens the information he did was necessary to be shown to obtain a thorough comprehension of the case.

When Miss Elmer Stephens was on the witness stand, on cross-examination, appellant propounded to her the question: "If she was willing to undergo a medical examination to determine who was telling the truth in the matter. The State objected to the question, and the court sustained the objection. Appellant does not state in the bill what the answer of the witness would have been, nor what he expected it to be, nor that if she agreed to undergo an examination what he believed would be the result. We might infer that he hoped the examination would demonstrate she had had intercourse with some man, but this would not indirectly tend to prove that appellant was the person with whom she had intercourse. We have always held that where a medical examination has been held the physicians were properly permitted to testify to the conditions found, but a court can hardly be expected to stop a trial and hold it in abeyance while such an examination is being conducted. Such a request ought to be timely made, if made in good faith, that such an examination can be held without delaying the court in its orderly proceedings. We can see no reason why the appellant should not be permitted to make such request, and that the young lady be given an opportunity to permit the examination or refuse to do so. This would be a matter that the court could not force her to undergo, but she might be given the opportunity to do so, if agreeable with her, but a request for such a proceeding at this instance being propounded in the midst of the trial, we can not say the court erred in his ruling in refusing to permit the trial to be delayed and such an inquiry at such a time.

The court did not read his charge to the jury before argument, but

did submit it to counsel before reading it to the jury. This is a misdemeanor case, and, as before held by this court, it is the better practice to read the charge to the jury, as in felony cases, before argument, but this is not mandatory in misdemeanor cases. Appellant would have the right to except to the charge when presented to him, but the record shows he reserved no exception to it when he was given an opportunity to read it, and not doing so at that time, complaint could not be made for the first time in the motion for a new trial. When he was given an opportunity to read it, before it was read to the jury, then was the time for him to make his objection and request any corrections he desired.

The court did not err in refusing the peremptory instructions to acquit, nor err in refusing to give the special charge asking the court to instruct the jury, that as a matter of law, the affidavit made by appellant was a privileged communication.

The judgment is affirmed.

*Affirmed:*

[Rehearing denied November 17, 1915.—Reporter.]